**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ x

HYBRID NYC LLC,                                            :

                                                          :

                                    *Plaintiff*,          :          Civil Action No.

                                                          :

                -against-                                 :          **COMPLAINT**

                                                          :

NEW YORK STATE CANNABIS CONTROL            :

BOARD, NEW YORK STATE OFFICE OF            :

CANNABIS MANAGEMENT, TREMAINE              :

WRIGHT, in her official capacity as the Chairwoman    :

of the New York State Cannabis Control Board, and     :

FELICIA A.B. REID, in her official capacity as         :

Executive Director of the New York State Office of    :

Cannabis Management,                                     :

                                                          :

                                    *Defendants*.         :

------------------------------------------------------------------ x

        Plaintiff HYBRID NYC LLC ("Hybrid" or "the Company" or "Plaintiff"), as and for its

Complaint against Defendants New York State Cannabis Control Board ("CCB"), New York State

Office of Cannabis Management ("OCM"), Tremaine Wright, in her official capacity as

Chairwoman of the New York State Cannabis Control Board ("Wright"), and Felicia A.B. Reid,

in her official capacity as Executive Director of the New York State Office of Cannabis

Management ("Reid," and together with Wright, CCB, and OCM, the "Defendants"), states and

alleges as follows:

## NATURE OF THE ACTION

1.      This action for declaratory relief arises from the unconstitutional mandate in the New York Marihuana Regulation and Taxation Act (the "MRTA")[1] – and in New York's auxiliary adult-use cannabis rules and regulations[2] – that requires all New York adult-use (and medical) cannabis companies to execute a labor peace agreement (the "LPA") in order to obtain or to renew a license, and that requires them to maintain a labor peace agreement as "an ongoing material condition for licensure".  This mandate conflicts with, and is preempted by, the National Labor Relations Act (the "NLRA").[3]

2.      The NLRA creates a uniform and exclusive nationwide system for union organizing and collective bargaining.  The NLRA's preemption doctrine – a body of law originating with the *Machinists* case[4] – precludes state and local governments from regulating union activity that the NLRA does not cover, and from favoring either employers or employees when Congress intended to leave their contest to market forces.

3.      Notwithstanding the *Machinists* doctrine, New York's Legislature nonetheless inserted an LPA requirement into the MRTA that required cannabis license holders to agree to LPAs with unions – with little-to-no room to meaningfully negotiate – as a condition to maintaining the license in good standing.

4.      Moreover, the MRTA further mandates that the LPA requirement may only be satisfied by entering into an LPA with "a bona-fide labor organization that is actively engaged in

---

[1] *See* MRTA § 64(1)(i).  *See also* MRTA § 66(5) (LPA is a "material condition" of a license's renewal).

[2] *See generally* 9 NYCRR §§ 118-121, 123-125, and 131 (the "New York Adult-Use Cannabis Rules").  *See, e.g.*, 9 NYCRR §§ 120.2(a)(2)(xx), 120.4(c)(2), 120.11(c)(2), and 120.12(b)(1).

[3] *See* 29 U.S.C. §§ 151-169.

[4] *See Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp. Rels. Comm'n*, 427 U.S. 132, 149 (1976) ("*Machinists* preemption").

representing or attempting to represent the applicant's employees."  MRTA § 64(1)(i).  In New York's nascent cannabis industry, Local 338, RWDSU/UFCW ("Local 338" or the "Union") is one of the only – if not the only – labor union that meets this standard, thus further limiting the ability of cannabis license holders to meaningfully negotiate the terms of their LPAs.  Indeed, it is believed that Local 338 is the counterparty to nearly every LPA in existence with cannabis license holders in New York.

5.    These LPAs provide unions (and Local 338 in particular) with advantages in collective bargaining they otherwise would not possess.  For example, these LPAs force employers to (i) forsake their statutory (and First Amendment) rights to deprecate unionization,[5] (ii) grant unions' access to their premises, and (iii) divulge their employees' addresses, phone numbers, e-mail addresses, and other contact information.  These concessions short-circuit the negotiating process between labor and management and ease the path for unions to obtain recognition of a cannabis company's employees.  In an effort to obviate their legislative overreach, the drafters of the MRTA attempted to invoke a recognized exception to *Machinists* preemption – the so-called "market participation doctrine"[6] – by suggesting that the State maintains a "proprietary interest" in the cannabis industry.

6.    Specifically, MRTA § 3(29) reads as follows:

> "Labor peace agreement" means an agreement between an entity and a labor organization that, at a minimum, **protects the state's proprietary interests** by prohibiting labor organizations and members from engaging in picketing, work stoppages, boycotts, and any other economic interference with the entity.

(Emphasis added).

---

[5] *See* 29 U.S.C. § 158(c).

[6] *See, e.g.*, *Chamber of Com. of U.S. v. Brown*, 554 U.S. 60, 70 (2008) (when the state is acting as a proprietor in the market, rather than as a regulator, the NLRA and its preemption doctrine does not apply).

3

7.      New York State, however, does not – and cannot – possess a proprietary interest in the cannabis companies that do business within its borders for multiple reasons.  First, licenses – whether for cannabis, alcohol, fishing, or some other industry – confer privileges.  They comprise neither real nor intangible property.[7]  Second, New York State does not accrue a "proprietary interest" in either the license, or in the business receiving it, simply by virtue of having issued it.  Third, at least one New York court already has rejected the applicability of the "market participation exception" to New York State's cannabis industry.[8]  Finally, New York cannot possess a proprietary interest in cannabis businesses without violating the federal Controlled Substances Act.[9]

8.      In short, New York cannot obviate the NLRA's *Machinists* preemption doctrine and interpose an LPA requirement on cannabis licensees.

9.      Accordingly, the MRTA's mandate that cannabis licensees enter into an LPA (and the accompanying New York Adult-Use Cannabis Rules) (i) encroaches upon the NLRA's exclusive authority over labor relations in the United States, and (ii) violates the Supremacy Clause of the U.S. Constitution.

10.     As such, Plaintiff now seeks an order (i) declaring that the MRTA's LPA mandate is unconstitutional, (ii) declaring that any and all provisions in the MRTA and the New York Adult-Use Cannabis Rules that concern LPAs are null and void, (iii) declaring that Defendants cannot

---

[7] *See, e.g.*, *Pizzaguy Holdings LLC v. N.Y. Liquor Auth.*, 39 A.D.3d 1072, 1074 (3d Dep't 2007) (license to sell liquor is not a property right).

[8] *See Variscite NY One, Inc. v. New York*, 640 F.Supp.3d 232, 242 n.7 (N.D.N.Y 2022) (State's loaning of money to cannabis licensee does not make it a market participant because it is not earning a profit from the business).

[9] *See* Robert A. Mikos, *Preemption Under The Controlled Substances Act*, 16 J. HEALTH CARE L. & POL'Y, 5, 32-36 (2013) (state programs that subsidize and/or promote violations of the Controlled Substances Act directly conflict with federal law, violate the Supremacy Clause and are constitutionally invalid).  *See also* Mem. from Kleinbard LLC to Pa. Cannabis Coal., *Preemption Principles Implicated by LCB Sale of Recreational Marijuana* (Mar. 19, 2025) (on file with LAW360) (State of Pennsylvania cannot own or operate cannabis dispensaries without causing positive conflict with the Controlled Substances Act).

sanction any adult-use cannabis license for canceling or violating its LPA, (iv) declaring that Defendants cannot condition the award, maintenance, or renewal of any adult-use cannabis license on the presence or absence of an LPA, and (v) awarding such further relief the Court deems just and proper.

## PARTIES

11.     Plaintiff Hybrid NYC LLC is a New York limited liability company formed in 2022 with its principal place of business at 296 Kent Avenue in Brooklyn, New York.  Hybrid earned a conditional adult-use retail cannabis license on September 20, 2024, opened a dispensary under the name Gotham, and commenced adult-use retail cannabis sales on October 8, 2024.  In order to receive its license, Hybrid executed an LPA with Local 338 on March 4, 2024.

12.     Defendant New York State Cannabis Control Board is a government-appointed board that the MRTA established to promulgate rules and regulations for New York's cannabis industry and is vested with the powers and duties stipulated in MRTA § 10.  It consists of a chairperson and four other voting members.

13.     Defendant New York State Office of Cannabis Management is an independent office that the MRTA established within the Division of Alcoholic Beverage Control.

14.     Defendant Tremaine Wright is the Chairwoman of CCB, having the powers and duties granted to her, and she is named in her official capacity only.

15.     Defendant Felicia A.B. Reid is the Executive Director of OCM, having the powers and duties granted to her, and she is named in her official capacity only.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over the matters asserted herein under 28 U.S.C. § 1331 because the action involves questions under the United States Constitution.

17.    This Court has personal jurisdiction over Defendant New York State Cannabis Control Board because it is a citizen of New York and maintains an office at 59 Maiden Lane, New York, New York, 10038.

18.    This Court has personal jurisdiction over Defendant New York State Office of Cannabis Management because it is a citizen of New York and maintains an office at 59 Maiden Lane, New York, New York, 10038.

19.    This Court has personal jurisdiction over Defendant Tremaine Wright because, upon information and belief, she is a domiciliary of New York and she took the actions complained of herein while in New York.

20.    This Court has personal jurisdiction over Defendant Felicia A.B. Reid because, upon information and belief, she is a domiciliary of New York and she took the actions complained of herein while in New York.

21.    Venue is proper in this Judicial District under 28 U.S.C. § 1391(b) because, upon information and belief, OCM holds an office on 59 Maiden Lane, New York, New York, 10038.

## **BACKGROUND**

## **THE MRTA AND THE ADULT-USE CANNABIS RULES AND REGULATIONS**

22.    On March 31, 2021, the Legislature enacted the MRTA, *inter alia*, to (i) regulate and tax medical and adult-use cannabis, and (ii) craft a licensing regime that authorizes the cultivation, processing, distribution, and sale of adult-use and medical cannabis in New York State.

23.    The MRTA created OCM as a separate and independent division of New York's Division of Alcoholic Beverage Control, and entrusted OCM with regulatory oversight of the adult-use and medical cannabis marketplace.[10]  The MRTA also created CCB – the members of

---

[10] MRTA § 8.

which are jointly appointed by the Governor, the Assembly, and the Senate – in order to oversee OCM.[11]

24.     The MRTA tasked CCB with promulgating rules and regulations to govern the adult-use and medical cannabis markets.[12]

25.     On September 27, 2023, CCB published a Notice of Adoption that officially promulgated the operating rules and regulations for the adult-use cannabis industry.[13]

26.     The MRTA delineates eleven adult-use license types and strictly divided the market's licensees into two tiers: (i) cultivation and production, on the one hand, and (ii) retail, on the other.[14]   And much like the alcohol industry, the MRTA prohibited parties (aside from the grandfathered medical licensees and certain microbusinesses) from maintaining ownership interests across those two tiers.

27.     Among the MRTA's stated objectives are "to regulate, control, and tax marihuana . . . generate significant new revenue, [and] make substantial investments in communities and people most impacted by cannabis criminalization to address the collateral consequences of such criminalization."[15]

---

[11] *Id.* § 7.

[12] CCB, in turn, also has the authority to delegate any of its functions, powers and duties, except promulgating rules and regulations, to the executive director of OCM.  *Id.* § 10(23).

[13] *See* New York Adult-Use Cannabis Rules.  New York, however, adopted the rules and regulations for the conditional adult-use retail dispensary license (9 NYCRR § 116) in March 2022.

[14] *See* MRTA §§ 68-75, 77.  The different license types consist of: (i) an adult-use cultivator license; (ii) an adult-use processor license; (iii) adult-use cooperative license; (iv) an adult-use distributor license; (v) an adult-use dispensary license; (vi) microbusiness license; (vii) delivery license; (viii) nursery license; (ix) an adult-use consumption license; (x) the ROD license; and (xi) the ROND license.  The microbusiness license and the ROD license, however, expressly authorize their recipients to produce cannabis and to retail cannabis, which is an exception to the general "two tier" licensing theme of the MRTA.

[15] *See id.* § 2.

28.    MRTA § 87 accordingly charges CCB with (i) the goal of awarding "*fifty percent of adult-use cannabis licenses to social and economic equity applicants*," and (ii) prioritizing applicants who (x) qualify as minority-owned businesses, women-owned businesses, distressed farmers, and service-disabled veterans, or (y) are from communities disproportionately impacted by cannabis prohibition.[16]

29.    Plaintiff counts among the beneficiaries of the MRTA's social justice mandate. Hybrid is a minority-owned business and its primary shareholder qualifies as a "justice-involved individual"[17] who was a victim of the War on Drugs' disproportionate targeting of communities of color.

## THE LPA REQUIREMENTS

30.    The MRTA contains three operative provisions (excerpted below) governing LPAs.

31.    Taken collectively, the MRTA's LPA provisions require a cannabis license holder to (i) execute an LPA with a "bona fide labor organization that is actively engaged in representing or attempting to represent the applicant's employees" in order to qualify for a license,[18] (ii) maintain its LPA in effect throughout the duration of its license, and (iii) reaffirm its LPA before applying to renew its license.

32.    First, MRTA § 3(29) reads:

"Labor peace agreement" means an agreement between an entity and a labor organization that, at a minimum, **protects the state's proprietary interests** by prohibiting labor organizations and

---

[16] *Id.* § 87(1)-(2) (emphasis added).

[17] A "justice-involved individual" is someone who has been convicted of a New York "marihuana-related offense" before March 31, 2021, or whose parent, spouse, child, legal guardian, or dependent has been convicted of a New York "marihuana-related offense" before then.  *See* NYCRR § 116.4(a)(2)(i).

[18] To qualify for any of the eleven adult-use cannabis licenses Defendant OCM issues, an applicant must submit (i) proof of an LPA, and (ii) an attestation that the applicant acknowledges that it must maintain the LPA throughout the license's duration.  *See* 9 NYCRR § 120.2(a)(2)(xx).

members from engaging in picketing, work stoppages, boycotts, and any other economic interference with the entity.

(Emphasis added).[19]

33.    Second, MRTA § 64 reads, in pertinent part, that:

The board shall develop regulations for use by the office in determining whether or not an applicant should be granted the privilege of an initial adult-use cannabis license, based on, but not limited to, the following criteria . . . (i) the applicant has entered into a labor peace agreement with a bona-fide labor organization that is actively engaged in representing or attempting to represent the applicant's employees, and the maintenance of such a labor peace agreement shall be an ongoing material condition of licensure. In evaluating applications from entities with twenty-five or more employees, the office shall give consideration to whether applicants have entered into an agreement with a statewide or local bona-fide building and construction trades organization for construction work on its licensed facilities.

34.    Finally, MRTA § 66(5) provides that, as "an ongoing condition of licensure," an applicant "must maintain a labor peace agreement with a bona fide labor organization that is actively engaged in representing or attempting to represent the applicant's employees".

35.    The New York Adult-Use Cannabis Rules contain three parallel provisions.[20]

36.    Specifically, 9 NYCRR § 120.2(a)(2)(xx) reads, in pertinent part, that:

An applicant and each true party of interest in an applicant shall provide information in a form and manner as prescribed by the Board, which may include, but is not limited to the following . . . (xx) a copy of the labor peace agreement between the applicant and a bona fide labor organization and an attestation that the applicant understands that the maintenance of such a labor peace agreement shall be an ongoing material condition of the license.

---

[19] The MRTA's definition of an LPA subsumes its purported rationale – "to protect the state's proprietary interests". However, this ostensible ground is a pretext designed to skirt the NLRA's preemptive effect. New York State does not possess a proprietary interest in any particular cannabis business or in the cannabis industry writ large. *See Variscite NY One, Inc.*, 640 F.Supp.3d at 242 n.7 (OCM/CCB are acting as regulators not as market participants).

[20] Together, the foregoing MRTA provisions and New York Adult-Use Cannabis Rules governing LPAs constitute "New York's Cannabis LPA Mandates" or "Defendants' Cannabis LPA Mandates".

37.     In addition, 9 NYCRR § 120.11(c)(2) reads, in pertinent part, that:

> The application for renewal shall be submitted to the Office, in a manner prescribed by the Board, and include such information as the Board may require, including, but not limited to, providing evidence showing the following . . . the licensee has an executed labor peace agreement with a bona-fide labor organization.

38.     Finally, 9 NYCRR § 120.12(b)(1) reads, in pertinent part, that:

> In addition to the aforementioned, the Board may specifically deny any renewal application based on additional criteria, including, but not limited to, if: (1) the applicant fails to maintain a labor peace agreement with a bona-fide labor organization.

## HYBRID'S ADULT-USE CANNABIS BUSINESS

39.     Between August 2022 and September 2022, Defendants solicited applications for conditional adult-use retail dispensary ("CAURD") licenses.

40.     Hybrid qualified as a CAURD applicant because its principal owner was a "justice-involved individual"[21] with a "qualifying business".[22]

41.     Defendants provisionally approved Hybrid on July 19, 2023, and awarded Hybrid a full-fledged adult-use cannabis retail license[23] on September 20, 2024.

42.     Hybrid commenced adult-use retail cannabis sales on October 8, 2024.

43.     In order for its application to qualify and obtain a license, Hybrid was obligated to execute an LPA and submit an attestation from its principal acknowledging that an LPA is an "ongoing material condition of the license."[24]

---

[21] *See supra* n.17.

[22] To be a "qualifying business," a justice-involved individual has to own at least ten (10) percent of an underlying business, and the business has to have realized profits for at least two years.  *See* 9 NYCRR § 116.4(a)(2)(iii).

[23] Defendant OCM will not issue an applicant a full-fledged retail cannabis license until it has secured a compliant real estate location and executed a lease for the premises.  Until then, if an applicant meets the other criteria, Defendant OCM will issue a provisional retail cannabis license.

[24] *See* 9 NYCRR § 116.3(a)(14).  *See also* 9 NYCRR § 116.7(c)(7).

44.    This presented Hybrid with a Hobson's choice – either (i) execute an LPA, or (ii) forgo the opportunity for a cannabis license in New York State.

45.    Left with little choice, Hybrid accordingly executed an LPA with Local 338.

46.    But for New York's Cannabis LPA Mandates, Hybrid would not have executed an LPA and would have reserved its rights under the NLRA to oppose unionization.

47.    In fact, Hybrid already provides its employees with wages and benefits that exceed the market rate.

48.    Among these generous emoluments figure the following:

- A base pay of $25 per hour ($7 above the market rate);

- 100% reimbursement of all medical and health benefits;

- A 401(k) plan that doubles the first 8% of each employee's contribution;

- 4 weeks of paid vacation along with 10 paid holidays, plus 2 paid appreciation days;

- Employee discounts of 40% on lifestyle products;

- Plans to grant certain employees incentive compensation for generating sales; and

- Monthly educational sessions on business operations, marketing, resume building, and financial literacy.

**THE HYBRID LPA**

49.    Upon information and belief, Local 338 knew that Hybrid had to enter into an LPA in order to receive and maintain a license under New York's Cannabis LPA Mandates.

50.    Thus, Local 338 provided Hybrid with an LPA granting the Union significant rights and concessions.

51.    Nevertheless, Hybrid executed its LPA on March 1, 2024.[25]

---

[25] Attached hereto as Exhibit A is a true and correct copy of Hybrid's current LPA (the "Hybrid LPA").

52.     These concessions conflict with federal labor law and principles of free speech, and predetermine outcomes that the NLRA and *Machinists* preemption doctrine reserve for the give-and-take negotiations between labor and management.

53.     For example, the Hybrid LPA prohibits Hybrid from deprecating unionization and thereby from exercising its statutory rights pursuant to Section 8(c) of the NLRA[26] and its constitutional right to free speech.

54.     As a consequence, the Hybrid LPA bars Hybrid from informing its employees of the superior benefits it can offer its employees if they reject unionization and/or of the financial liabilities an employee incurs through membership in Local 338 (or its parent unions, the United Food and Commercial Workers or Retail, Wholesale Department Store Union).  (*See* Exhibit A ¶ 3.)

55.     The Hybrid LPA describes this draconian prohibition on Hybrid's statutory (and constitutional) rights by stating that Hybrid must remain "neutral".

56.     Specifically, Paragraphs 3(b) and 3(c) of the Hybrid LPA provide, in pertinent part, as follows:

> (b) The Employer agrees to take a neutral approach to unionization of employees. Neutrality means that the Employer will neither help nor hinder the Union's organizing effort. Both the Union and the Employer will conduct themselves with mutual respect for each other during any organizing effort.
>
> (c) During organizing efforts, the Employer's managers, supervisors and other representatives will remain neutral.

(*See id.* ¶¶ 3(b)-3(c).)

57.     But this so-called "neutrality" obligation is not reciprocal.

---

[26] Section 8(c)(1) of the NLRA protects the right of employers to express any view, argument, or opinion about unionization as long as the speech does not threaten the employees or promise them benefits.  *See* 29 U.S.C. § 158(c) (1976).

58.     Local 338 may waylay Hybrid's employees in order to impart the supposed benefits of unionization.

59.     In fact, the Hybrid LPA even compels Hybrid to grant Local 338 access to the Hybrid's dispensary on multiple occasions for this purpose if the Union so elects.

60.     In particular, Paragraph 3(d) provides, in pertinent part, as follows:

> (d) Upon seventy-two hours-notice, the Employer agrees to permit the Union representatives a meeting with the employees at the Location to communicate with employees including through the distribution of materials… It shall be noted that the organizing effort may take more than one meeting to adequately allow the employees to be informed about the Union.

(*See id.* ¶ 3(d).)

61.     In addition, the Hybrid LPA requires Hybrid to furnish Local 338 with its employees' names, job classifications, departments, e-mail addresses, telephone numbers, and street addresses during the organizing process.  (*See id.* ¶ 3(a).)

62.     But for the Hybrid LPA, Hybrid could shield its employees' phone numbers and e-mail addresses.

63.     Also, the Hybrid LPA circumvents the customary collective bargaining process and coerces the Company into authorizing an arbitrator to decide contested issues if the parties cannot reach agreement within one (1) year.  (*See id.* ¶ 3(f).)

64.     Finally, the Hybrid LPA predetermines Local 338 as the designated union for Hybrid and deprives Hybrid's employees of the right to select a union of their choosing.

65.     Accordingly, the Hybrid LPA violates the guarantee in NLRA Section 7 of employee self-determination.[27]

---

[27] *See Balt. Sun Co. v. N.L.R.B.*, 257 F.3d 419, 426 (4th Cir. 2001) (NLRA § 7 guards "with equal jealousy employees' selection of the union of their choice and their decision not to be represented at all.").

**LOCAL 338 CLAIMS TO REPRESENT HYBRID'S EMPLOYEES**

66.     In a letter dated April 1, 2025, Local 338 notified Hybrid that a majority of Hybrid's employees allegedly had chosen the Union to represent them for purposes of collective bargaining (the "Local 338 Letter").[28]

67.     The Local 338 Letter claimed that Hybrid has fourteen (14) days to recognize the Union as its employees' representative and cited a provision of the Hybrid LPA allegedly obligating Hybrid to sign a Recognition Agreement.  (*See* Exhibit B; *see* Exhibit A at ¶ 3(e).)

68.     Hybrid rejects Local 338's assertions for several reasons, including, but not limited to, (i) the constitutionality of New York's Adult-Use Cannabis Rules, (ii) the validity of the Hybrid LPA which Hybrid only entered into because of New York's Adult-Use Cannabis Rules, (iii) the legitimacy of the authorization cards that underpin Local 338's claim to recognition, and (iv) the foundation of Hybrid's putative obligations to recognize the Union pursuant to Paragraph 3(e) in the Hybrid LPA.

69.     The requirement that Hybrid maintain an LPA as "an ongoing material condition of licensure" accordingly injures Hybrid and threatens its adult-use cannabis license if Hybrid and Local 338 cannot resolve their dispute.

70.     Hybrid asks this Court to intervene, in part, to forestall this unjust result.

**THE MRTA'S LPA PROVISIONS VIOLATE THE NLRA**

71.     The NLRA entrusts the federal government with exclusive and preemptive authority over labor relations in general and over the organizing process for all private sector

---

[28] Attached hereto as Exhibit B is a true and correct copy of the Local 338 Letter.

employers in particular.

72.     The NLRA governs union organizing, collective bargaining, selection of union representatives, and the dispute resolution process and preempts any state or municipal statutes, ordinances, rules or regulations that intrude upon the federal government's legal scheme.

73.     The NLRA's preemption jurisprudence follows two precedential lineages: the cases descended from (i) *San Diego Building & Trade Council v. Garmon* (so-called "*Garmon* preemption")[29], and (ii) *Lodge 76, International Association of Machinists & Aerospace Workers v. Wisconsin Employment Relations Commission* (so-called "*Machinists* preemption").[30]

74.     Applied together, they narrowly circumscribe the authority of state and local governments to regulate labor relations and bar labor peace agreements in the private sector.

75.     The *Machinists* preemption doctrine prevents state and local governments from requiring LPAs to encourage unionization because the NLRA does not contemplate LPAs.

76.     Instead, Congress intended to leave many of the organizing concessions that LPAs provide to the free play of market forces.

77.     In addition, some commonplace LPA provisions run afoul of the *Garmon* preemption doctrine by conflicting directly with the NLRA.

78.     There is one notable exception to the NLRA's preemption doctrine:  namely, the so-called "market participation exception."

79.     The "market participant exception" applies when a state or municipality enters the marketplace and acts as a proprietor rather than as a regulator.

---

[29] *See San Diego Building & Trade Council v. Garmon*, 359 U.S. 236, 245 (1959).

[30] *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers*, 427 U.S. at 149.

80.    Thus, when the State acts as a "market participant" it may require potential counterparties to enter LPAs or provide other labor concessions.

81.    The following examples illustrate the "market participation" exception's limited scope.

- When a state/municipality owns real estate and collects rent revenue;

- When a state/municipal development project (like an airport) generates revenue that a state uses to repay state loans or municipal bonds; or

- When a state/municipality contracts with private parties to deliver government services.

82.    None of the foregoing circumstances applies to New York's cannabis industry.

83.    In other words, Defendants do not act as a "market participant" in New York's cannabis industry.[31]

84.    Rather, Defendants perform the traditional function of government regulators: *inter alia*, they issue licenses;[32] they enact rules; they oversee compliance; they hold hearings; they inspect premises; and they evaluate price controls.  *See* MRTA §§ 10-11.

85.    The MRTA's ostensible rationale for a "labor peace agreement" – "to  protect the state's proprietary interests by prohibiting labor organizations and members . . . from engaging in . . . economic interference with the entity" – cannot suffice to establish the "market participant exception," because Defendants do not possess a "proprietary interest" in New York's cannabis businesses, and New York cannot do so without violating the federal Controlled Substances Act.[33]

86.    In short, Defendants cannot rely on the "market participation" exception.

---

[31] *See Variscite NY One, Inc.*, 640 F.Supp.3d at 242 n.7.

[32] *See Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 619 (1986) (city not acting as market participant in licensing of taxi cabs).

[33] *See supra* n.9.

87.     Accordingly, the *Machinists* doctrine applies and the NLRA preempts New York's Cannabis LPA Mandates.

88.     The Hybrid LPA was constrained by New York's unconstitutional LPA Mandates, and as a consequence, it conflicts with fundamental provisions of federal labor law.

89.     For all of the foregoing reasons, the Hybrid LPA is void *ab initio*.

**<u>CAUSE OF ACTION</u>**
**Request For Declaratory Relief Invalidating New York's Cannabis LPA Mandates as Preempted by the NLRA**

90.     Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1 to 89 as if fully set forth herein.

91.     The NLRA governs labor relations for private sector employers.[34]

92.     The NLRA's statutory provisions and the National Labor Relations Board's auxiliary rules create an exhaustive and exclusive regulatory scheme for labor relations, including but not limited to the process for union selection, union recognition, collective bargaining, employer communications and dispute resolution.

93.     The NLRA preempts state and municipal laws and regulations that regulate labor activity and/or that legislate in legal terrain that the NLRA either protects, prohibits or leaves unregulated altogether.

94.     The NLRA's regulatory scheme does not countenance labor peace agreements because they, *inter alia*, (i) compel employers to grant unions organizing concessions, (ii) prevent employer's from exercising their statutory right to deprecate unionization, (iii) deprive employees of a right to select a union of their choice, (iv) violate employees' rights to privacy, and (v)

---

[34] The NLRA excludes from the definition of employer "governmental entities, railroads, and airlines" (29 U.S.C. § 152(2)) and excludes from the definition of employee "agricultural laborers, domestic service employees, independent contractors, and supervisors."

predetermine the outcome of sundry negotiated issues that the NLRA, through its silence, consigned to the free play of market forces.

95.     New York's Cannabis LPA Mandates intrude upon the NLRA's exclusive regulatory scheme by requiring Plaintiff (and all adult-use cannabis licensees) to execute a labor peace agreement with a "bona fide labor organization" and to maintain it as an "ongoing material condition of licensure."

96.     New York's Cannabis LPA Mandates are preempted by the NLRA pursuant to *Machinists* preemption doctrine enunciated in *Lodge 76, International Association of Machinists & Aerospace Workers v. Wisconsin Employment Relations Commission*, 427 U.S. 132 (1976) and violate Article VI, Clause 2 (the "Supremacy Clause") of the United States Constitution.

97.     Accordingly, the NLRA preempts and annuls the following New York Cannabis LPA Mandates: (i) MRTA § 3(29), (ii) MRTA § 64(1)(i), (iii) MRTA § 66(5), (iv) 9 NYCRR § 120.2(a)(2)(xx), (v) 9 NYCRR § 120.11(c)(2), (vi) 9 NYCRR § 120.12(b)(1), (vi) 9 NYCRR § 116.3(a)(14), and (vii) 9 NYCRR § 116.7(c)(7).

**WHEREFORE**, Plaintiff respectfully requests that the Court enter an order and judgment against Defendants pursuant to 28 U.S.C. § 2201 and grant Plaintiff the following relief:

(a)     On its Cause of Action, (i) declaring that the MRTA's LPA mandate is unconstitutional; (ii) declaring any and all provisions in the MRTA and the New York Adult-Use Cannabis Rules concerning LPAs null and void; (iii) declaring that Defendants cannot sanction any adult-use cannabis licensee for canceling or violating its LPA; and (iv) declaring that Defendants cannot condition the award, maintenance, or renewal of any adult-use cannabis license on the presence or absence of an LPA; and

(b)     Awarding Plaintiff fees, costs, expenses, and disbursements, including reasonable

attorneys' fees; and

(c)     Granting such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        April 14, 2025

                                        FEUERSTEIN KULICK LLP

                                        By:  _/s/ David Feuerstein_____
                                              David Feuerstein
                                              Matthew Schweber
                                              420 Lexington Ave, Suite 2024
                                              New York, New York 10170
                                              Tel: (646) 768-0591
                                              david@dfmklaw.com
                                              matt@dfmklaw.com
                                              *Attorneys for Plaintiff*