UNITED STATES DISTRICT COURT OF NEW YORK
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

HYBRID NYC LLC,                                     :
                                                    :
                                  *Plaintiff,*      :     Case No. 1:25-cv-03067-AKH
                                                    :
                      -against-                     :
                                                    :
NEW YORK STATE CANNABIS CONTROL              :
BOARD, NEW YORK STATE OFFICE OF              :
CANNABIS    MANAGEMENT,    TREMAINE          :
WRIGHT, in her official capacity as the Chairwoman  :
of the New York State Cannabis Control Board, and   :
FELICIA A.B. REID, in her official capacity as      :
Executive Director of the New York State Office of   :
Cannabis Management,                                :
                                                    :
                                  *Defendants*.     :

-------------------------------------------------------------------- X

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
### <u>MOTION FOR SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT  .......................................................................................1

THE RELEVANT FACTS AND PROCEDURAL HISTORY..........................................5

    A.  The MRTA and Cannabis Regulations..................................................................5

    B.  The LPA Mandates ...............................................................................................6

    C.  Hybrid's Adult-Use Cannabis Business.................................................................7

    D.  The Terms of the LPA ...........................................................................................8

    E.  Local 338 Claims to Represent Hybrid's Employees ...........................................10

    F.  Procedural History .................................................................................................10

ARGUMENT.....................................................................................................................11

    I.  THE LPA MANDATES SHOULD BE INVALIDATED DUE TO
       *MACHINISTS* PREEMPTION........................................................................12

          A.  Imposing a Contract on Hybrid Is "Anathema" to the NLRA................................13

          B.  The "Market Participant" Exception Does Not Apply ..........................................15

    II.  THE LPA MANDATES SHOULD ALSO BE INVALIDATED BECAUSE OF
        *GARMON* PREEMPTION.................................................................................18

          A.  The LPA Mandates Are Preempted Under Section 7 of the NLRA ......................18

          B.  The LPA Mandates Are Preempted By Section 8 of the NLRA ...........................20

CONCLUSION...................................................................................................................22

## TABLE OF AUTHORITIES

**CASES**  **PAGE(S)**

*Airlines for Am. v. City and County of San Francisco*
 78 F.4th 1146 (9th Cir. 2023) ........................................................................3, 15

*Associated Builders & Contractors of R.I., Inc. v. City of Providence*
 108 F. Supp. 2d 73 (D.R.I. 2000)....................................................................17

*Baby Watson Cheesecake, Inc.*
 320 NLRB 779 (1996) ....................................................................................19

*Bldg. Trades Emps.' Educ. Ass'n v. McGowan*
 311 F.3d 501 (2d Cir. 2002)...................................................................... *passim*

*Casala, LLC v. Kotek*
 789 F. Supp. 3d 1025 (D. Or. 2025) .......................................................... *passim*

*Chamber of Com. of U.S. v. Brown*
 554 U.S. 60 (2008)...................................................................................... *passim*

*Connecticut ex rel. Blumenthal v. Crotty*
 46 F.3d 84 (2d Cir. 2003) ...............................................................................12

*Derrico v. Sheehan Emergency Hosp.*
 844 F.2d 22 (2d Cir. 1988)...........................................................................3, 13

*Fernbach ex rel. N.L.R.B. v. Sprain Brook Manor Rehab, LLC*
 91 F. Supp. 3d 531 (S.D.N.Y. 2015)................................................................20

*Golden State Transit Corp. v. Los Angeles*
 475 U.S. 608 (1986)..................................................................................... *passim*

*Golden State Transit Corp. v. Los Angeles*
 493 U.S. 103 (1989)........................................................................12, 14, 18

*Huawei Techs. Co., Ltd. v. PanOptis Patent Mgmt., LLC*
 No. 24 CIV. 4708 (AKH), 2026 WL 374982 (S.D.N.Y. Feb. 10, 2026).....................11

*H. K. Porter Co. v. N.L.R.B.*
 397 U.S. 99 (1970)..........................................................................................13

*Intertape Polymer Corp. v. N.L.R.B.*
 801 F.3d 224 (4th Cir. 2015) ...........................................................................21

*Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wisconsin Emp. Rels. Comm'n*
 427 U.S. 132 (1976)...................................................................................... *passim*

*Metro. Milwaukee Ass'n of Comm. v. Milwaukee County*
    431 F.3d 277 (7th Cir. 2005) ................................................................... *passim*

*N.L.R.B. v. Gissel Packing Co.*
    395 U.S. 575 (1969)......................................................................................20

*N.L.R.B. v. Katz's Delicatessen of Houston St., Inc.*
    80 F.3d 755 (2d Cir. 1996).......................................................................19, 20

*N.L.R.B. v. Local Union No. 103*
    434 U.S. 335 (1978).....................................................................................19

*N.Y. Bankers Ass'n v. City of New York*
    119 F. Supp.3d 158 (S.D.N.Y. 2015)............................................... *passim*

*Penn. Nurses Ass'n v. Penn. State Educ. Ass'n*
    90 F.3d 797 (3d Cir. 1996)...........................................................................19

*San Diego Bldg. Trades Council v. Garmon*
    359 U.S. 236 (1959)..................................................................... *passim*

*Sheraton-Kauai Corp. v. N.L.R.B.*
    429 F.2d 1352 (9th Cir. 1970) ................................................................19, 20

*Selevan v. New York Thruway Auth.*
    584 F.3d 82 (2d Cir. 2009)...........................................................................17

*Variscite NY One, Inc. v. New York*
    640 F. Supp. 3d 232 (N.D.N.Y. 2022)...............................................15, 16, 17

*Variscite NY Four, Inc. v. New York State Cannabis Control Bd.*
    152 F.4th 47 (2d Cir. 2025) ..........................................................................17

## STATUTES AND OTHER AUTHORITIES

29 U.S.C. § 151.................................................................................................1

29 U.S.C. § 157.................................................................................................5

29 U.S.C. § 158(a)-(b) ....................................................................................19

9 NYCRR § 116.3(a)(14).................................................................................1, 2

9 NYCRR § 116.4(a)(2)(iii)...............................................................................8

9 NYCRR § 116.7(c)(7).................................................................................1, 2

9 NYCRR § 120.2(a)(2)(xx) ...................................................................1, 2, 6, 20

iii

9 NYCRR § 120.11(c)(2)................................................................1, 2, 7

9 NYCRR § 120.12(b)(1) ..............................................................1, 2, 7

FED. R. CIV. P. 56 .......................................................................1, 11

MRTA § 2 ...................................................................................4, 16, 22

MRTA § 3(29) ............................................................................2, 17

MRTA § 64(1)(i)..........................................................................1, 2, 20

MRTA § 66(5) ............................................................................1, 2, 6

Plaintiff Hybrid NYC LLC ("Hybrid" or "Plaintiff"), by and through its undersigned counsel, respectfully submits the instant memorandum of law in support of its motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 (the "Motion") against Defendants New York State Cannabis Control Board ("CCB"), New York State Office of Cannabis Management ("OCM"), Tremaine Wright, in her official capacity as Chairwoman of the Cannabis Control Board ("Wright"), and Felicia A.B. Reid ("Reid"), in her official capacity as Executive Director of the Office of Cannabis Management (collectively the "Defendants").

## **PRELIMINARY STATEMENT**

New York's Marihuana Regulation and Taxation Act[1] and the regulations that Defendants have promulgated to effectuate its purpose[2] impose an unconstitutional requirement on New York cannabis companies (like Hybrid) to execute a "Labor Peace Agreement" or "LPA" as an "ongoing material condition" for obtaining and maintaining their cannabis licenses.  *See* MRTA §§ 64(1)(i), 66(5); 9 NYCRR §§ 116.3(a)(14), 116.7(c)(7), 120.2(a)(2)(xx), 120.11(c)(2), 120.12(b)(1) (together the "LPA Mandates" or "New York's LPA Mandates").  As set forth more fully below, New York's LPA Mandates violate the broad preemptive effect of the National Labor Relations Act.[3]  *See Metro. Milwaukee Ass'n of Com. v. Milwaukee Cnty.*, 431 F.3d 277, 278 (7th Cir. 2005) (NLRA preempts LPA ordinances if state is not acting as a market participant); *Casala, LLC v. Kotek*, 789 F. Supp. 3d 1025, 1038-41 (D. Or. 2025) (NLRA preempts Oregon's LPA requirement for cannabis licenses); *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244-45 (1959) (so-called "*Garmon* preemption"); *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp. Rels. Comm'n*, 427 US. 132, 149 (1976) (so-called "*Machinists* preemption").

---

[1] N.Y. CANNABIS LAW et seq. (the "MRTA").

[2] 9 NYCRR §§ 116, 118-121, 123-125, 131 (the "Cannabis Regulations").

[3] 29 U.S.C. § 151 et. seq. (the "NLRA").

Given the LPA Mandates, Hybrid (like all New York cannabis licensees) was required to enter into an LPA with Local 338, RWDSU/UFCW ("Local 338" or the "Union"), the only "bona-fide labor organization" in New York's nascent cannabis industry. *See* MRTA § 64(1)(i); 9 NYCRR §§ 120.2(a)(2)(xx), 120.12(b)(1). The LPA, in turn, provided Local 338 with more leverage than it otherwise would have possessed in its negotiations with Hybrid under the NLRA because it required Hybrid to, *inter alia*, (i) surrender its statutory (and First Amendment) right of free speech by requiring Hybrid to take "a neutral approach" regarding the Union's attempts to organize Hybrid's employees,[4] (ii) grant the Union access to Hybrid's premises, (iii) divulge its employees' contact information so that the Union could solicit them for membership, (iv) commit to resolve all disputes regarding the LPA's meaning by arbitration (rather than before the National Labor Relations Board (the "NLRB")), and (v) submit all issues the parties cannot resolve through collective bargaining to final and binding arbitration. (*See* Pl.'s Ex. 10 §§ 3-4.)[5]

Put simply, the LPA Mandates required Hybrid to agree to an LPA that directly conflicts with the NLRA's provisions and/or intruded upon the terrain that Congress and the NLRA intended to leave to the free play of market forces. *See Lodge 76, Int'l Ass'n of Machinists*, 427 US. at 147-49. Accordingly, Hybrid now moves for summary judgment on its claim for a declaratory judgment that the relevant provisions of the MRTA and the Cannabis Regulations are preempted by the NLRA and, therefore, unconstitutional.[6]

---

[4] Hybrid's personnel are employed by Gotham NYC Management LLC ("Gotham") with which Hybrid has a management services agreement.

[5] References to "Pl.'s Ex." or "Plaintiff's Exhibit" refer to the exhibits annexed to (i) the declaration of David Feuerstein, dated as of March 27, 2026 ("Feuerstein Decl."), submitted simultaneously herewith, numbered 1 through 9, and (ii) the affidavit of Akindele Jeffrey-Coker ("Jeffrey-Coker Aff."), dated as of March 25, 2026, submitted simultaneously herewith, numbered 10 through 11.

[6] *See* MRTA §§ 3(29), 64(1)(i), 66(5); 9 NYCRR §§ 116.3(a)(14), 116.7(c)(7), 120.2(a)(2)(xx), 120.11(c)(2), 120.12(b)(1) (*i.e.*, the LPA Mandates).

This Court should grant Hybrid's motion for summary judgment and declare the LPA Mandates unconstitutional for at least the following two reasons:

First, the LPA Mandates conflict with the preemption doctrine laid out in *Lodge 76, International Association of Machinists & Aerospace Workers v. Wisconsin Employment Relations Commission*, 427 U.S. 132 (1976) and its progeny (the *Machinists* preemption doctrine), which bars states and municipalities from regulating elements of the labor-management bargaining process that Congress intended to leave to the free play of market forces. *See Bldg. Trades Emps.' Educ. Ass'n v. McGowan*, 311 F.3d 501, 509 (2d Cir. 2002). Indeed, courts have held that state and local laws that require LPAs violate the *Machinists* doctrine because they interfere with the bargaining process that Congress set forth in the NLRA. *See Metro. Milwaukee Ass'n of Com.*, 431 F.3d at 278-80 (invalidating LPA requirement for county contractors); *Casala, LLC*, 789 F. Supp. 3d at 1040-41 (invalidating LPA requirement for cannabis licenses); *see also Golden State Transit Corp. v. Los Angeles*, 475 U.S. 608, 616 (1986) ("*Golden State I*") ("The NLRA requires an employer and a union to bargain in good faith, but it does not require them to reach agreement."). Here, the LPA Mandates are a "coercive mechanism" that cannot be deployed where the state is acting in a regulatory capacity. *Airlines for Am. v. City and County of San Francisco*, 78 F.4th 1146, 1152 (9th Cir. 2023); *see also Golden State I*, 475 U.S. at 617 (state may not prohibit employer from using economic weapons at its disposal to prevent a strike); *Derrico v. Sheehan Emergency Hosp.*, 844 F.2d 22, 29 (2d Cir. 1988) ("imposing a contract on the parties" has "always been anathema to the NLRA.").

In fact, the United States District Court for the District of Oregon recently reached this **exact conclusion** in a case involving a provision of Oregon's cannabis law that required the execution of an LPA (known as "Measure 119"). In *Casala, LLC v. Kotek*, a cannabis operator

challenged Measure 119 which – like the LPA Mandates – conditioned cannabis license applications and renewals on the signing of an LPA. *Casala, LLC*, 789 F. Supp. 3d at 1032, 1040-41. In that case, the District Court of Oregon invalidated Measure 119 under the *Machinists* doctrine because it concluded that Measure 119 "regulates an area that Congress intended to leave to the free play of economic forces." *Id.* at 1040-41. The Court should reach the same result here.[7]

Defendants' only conceivable defense to *Machinists* preemption is that the LPA Mandates somehow fall within the "market participant" exception. But such an argument falls flat because New York's regulators were serving "in [their] capacity as a regulator rather than a market participant." *Chamber of Com. of U.S. v. Brown*, 554 U.S. 60, 70 (2008). Indeed, the MRTA makes clear that it was promulgated to "to regulate, control and tax marihuana." MRTA § 2. As if that were not enough (it is), New York does not – and cannot – possess a proprietary interest in the cannabis companies it licenses without violating the Controlled Substances Act.[8] *See Variscite NY One, Inc. v. New York*, 640 F.Supp.3d 232, 242 n.7 (N.D.N.Y. 2022) (noting that New York State acts as a government entity – not a private business – in the cannabis market). In fact, there is no evidence that Defendants are (i) acting as customers in the New York marketplace, or (ii) taking the place of "other private participants" in New York's cannabis market. Thus, this argument fails in its entirety. *N.Y. Bankers Ass'n, Inc. v. City of New York*, 119 F. Supp. 3d 158, 186 (S.D.N.Y. 2015).

---

[7] The District Court in *Casala* also rejected the State's argument that the NLRA does not apply to the state-legal cannabis industry because of the Controlled Substances Act. *Casala, LLC*, 789 F. Supp. 3d at 1040-41. However, as the District Court held, the NLRA applies to the "labor relations context" – not the underlying market. *Id.* Thus, any argument that the NLRA does not apply to the cannabis industry fails.

[8] *See* Robert A. Mikos, *Preemption Under The Controlled Substances Act*, 16 J. HEALTH CARE L. & POL'Y, 5, 32-36 (2013) (state programs that subsidize and/or promote violations of the Controlled Substances Act directly conflict with federal law, violate the Supremacy Clause and are constitutionally invalid); *see also* Mem. from Kleinbard LLC to Pa. Cannabis Coal., Preemption Principles Implicated by LCB Sale of Recreational Marijuana (Mar. 19, 2025) (on file with LAW360) (State of Pennsylvania cannot own or operate cannabis dispensaries without causing positive conflict with the Controlled Substances Act).

Second, New York's LPA Mandates conflict with Section 7 of the NLRA. Specifically, Section 7 of the NLRA provides that employees shall have the right to bargain (or not bargain) through a representative "*of their own choosing*." 29 U.S.C. § 157 (emphasis added). The LPA Mandates, however, required Hybrid to enter an LPA *before* obtaining its license (or hiring any employees). In other words, the LPA Mandates required Hybrid – as the employer – to select the Union (rather than allowing the employees to choose the union for themselves).[9] Pursuant to *Garmon* and its progeny, the LPA Mandates' requirement is preempted by the NLRA and, therefore, unconstitutional. *Chamber of Com. of U.S.*, 554 U.S. at 65; *Bldg. Trades Emps.' Educ. Ass'n*, 311 F.3d at 508, 512.

For all these reasons, the Court should (i) grant Hybrid's motion for summary judgment, (ii) declare that the LPA Mandates are preempted by the NLRA and, therefore, are unconstitutional, and (iii) grant such other relief as the Court deems just and proper.

## THE RELEVANT FACTS AND PROCEDURAL HISTORY

### A. The MRTA and Cannabis Regulations

On March 31, 2021, New York enacted the MRTA to (i) regulate and tax medical and adult-use cannabis, and (ii) create a licensing regime that authorizes the cultivation, processing, distribution, and sale of adult-use and medical cannabis in New York. (Statement of Material Facts ¶¶ 1-2.) The MRTA created the OCM to regulate the cannabis marketplace, and the CCB to oversee the OCM. (*Id.* ¶¶ 3-4.)

In Section 2 – entitled "Legislative findings and intent" – the MRTA provides:

> The intent of this act is *to regulate, control and tax marijuana*, heretofore known as cannabis, generate significant new tax revenue, make substantial investments in communities and people most

---

[9] As set forth in Section II(B), *supra*, the LPA Mandates also violate Hybrid's free-speech protections under Section 8 of the NLRA and the First Amendment.

impacted by cannabis criminalization to address collateral consequences of such criminalization, prevent access to cannabis by those under the age of twenty-one years, reduce the illegal drug market and reduce violent crime, reduce participation of otherwise law-abiding citizens in the illicit market, end the racially disparate impact of existing cannabis laws, create new industries, protect the environment, improve the state's resiliency to climate change, protect the public health, safety and welfare of the people of the state, increase employment and strengthen New York's agricultural sector.

(*Id.* ¶ 2 (emphasis added).)

## B. The LPA Mandates

Section 64 of the MRTA provides, in relevant part, that the CCB shall develop regulations to determine whether an applicant could be granted an adult-use cannabis license based on, among other things, whether:

[T]he applicant has entered into a labor peace agreement with a bona-fide labor organization that is actively engaged in representing or attempting to represent the applicant's employees, *and the maintenance of such a labor peace agreement shall be an ongoing material condition of licensure*.

(*Id.* ¶ 9 (emphasis added).)

The MRTA defines a "Labor Peace Agreement" as:

[A]n agreement between an entity and a labor organization that, at a minimum, protects the state's proprietary interests by prohibiting labor organizations and members from engaging in picketing, work stoppages, boycotts, and any other economic interference with the entity.

(*Id.* ¶ 8.) Section 66(5) of the MRTA provides that the maintenance of such an LPA is an "ongoing material condition of licensure." (*Id.* ¶ 10.)

On September 27, 2023, the CCB published the Cannabis Regulations, which contain three corresponding provisions addressing the MRTA's LPA requirement. (*Id.* ¶ 11.) More specifically, 9 NYCRR § 120.2(a)(2)(xx) reads, in pertinent part, that:

6

> An applicant and each true party of interest in an applicant shall provide information in a form and manner as prescribed by the Board, which may include, but is not limited to the following . . . (xx) a copy of the labor peace agreement between the applicant and a bona fide labor organization and an attestation that the applicant understands that *the maintenance of such a labor peace agreement shall be an ongoing material condition of the license*.

(*Id.* ¶ 14 (emphasis added).)

In addition, 9 NYCRR § 120.11(c)(2) reads, in pertinent part, that:

> The application for renewal shall be submitted to the Office, in a manner prescribed by the Board, and include such information as the Board may require, including, but not limited to, providing evidence showing the following . . . the licensee has an executed labor peace agreement with a bona-fide labor organization.

(*Id.* ¶ 15.)

Finally, 9 NYCRR § 120.12(b)(1) reads, in pertinent part, that:

> In addition to the aforementioned, the Board may specifically deny any renewal application based on additional criteria, including, but not limited to, if: (1) the applicant fails to maintain a labor peace agreement with a bona-fide labor organization.

(*Id.* ¶ 16.)

Together, these LPA Mandates require companies (like Hybrid) to have an LPA as a condition for obtaining and maintaining a license to operate any cannabis business in New York State.

## C. **Hybrid's Adult-Use Cannabis Business**

Between August 2022 and September 2022, Defendants solicited applications for conditional adult-use retail dispensary ("CAURD") licenses. (Jeffrey-Coker Aff. ¶ 6.) Hybrid qualified as a CAURD applicant because its principal owner was a "justice-involved individual"

with a "qualifying business."[10]  (*see id.* ¶ 8.)  Still, in order to obtain a cannabis license pursuant, the LPA Mandates required Hybrid to enter into an LPA with Local 338 – the only union known to be representing the employees of cannabis businesses at that time – which it did on March 4, 2024.  (*Id.* ¶ 12.)  On September 20, 2024, Hybrid received an adult-use cannabis retail license.[11] (Statement of Material Facts ¶ 22.)

But for the LPA Mandates, Hybrid would not have executed an LPA with the Union and would have reserved its rights under the NLRA to oppose unionization.  (Jeffrey-Coker Aff. ¶ 21.) But the LPA Mandates presented Hybrid with a Hobson's choice – either (i) execute an LPA (on highly unfavorable terms), or (ii) forgo the opportunity for a cannabis license in New York State. (*Id.* ¶ 22.)  Left with little choice, Hybrid executed an LPA with Local 338.  (Statement of Material Facts ¶ 25.)

### D.  The Terms of the LPA

Because Hybrid had no choice but to execute the LPA, Local 338 was able to negotiate for the inclusion of highly favorable terms (which were especially onerous for Hybrid).  (Jeffrey-Coker Aff. ¶¶ 14-15.)  For example, the LPA prohibits Hybrid and its managers, supervisors and representatives from exercising its statutory rights pursuant to Section 8(c) of the NLRA and its constitutional right to free speech.   (Pl.'s Ex. 10 §§ 3(b)-(c).)  More specifically, Sections 3(b) and 3(c) of the LPA provide, in pertinent part:

> The Employer agrees to take a neutral approach to unionization of employees. Neutrality means that the ***Employer will neither help***

---

[10] A "justice-involved individual" is someone who has been convicted of a New York "marihuana-related offense" before March 31, 2021, or whose parent, spouse, child, legal guardian, or dependent has been convicted of a New York "marihuana-related offense" before then.  NYCRR § 116.4(a)(2)(i).  To be a "qualifying business," a justice-involved individual has to own at least ten percent of an underlying business, and the business must have realized profits for at least two years.  *See* 9 NYCRR § 116.4(a)(2)(iii).

[11] Defendant OCM will not issue an applicant a full-fledged retail cannabis license until it has secured a compliant real estate location and executed a lease for the premises.  Until then, if an applicant meets the other criteria, Defendant OCM will issue a provisional retail cannabis license.

> ***nor hinder the Union's organizing effort***. Both the Union and the Employer will conduct themselves with mutual respect for each other during any organizing effort.
> During organizing efforts, ***the Employer's managers, supervisors and other representatives will remain neutral***.

(*Id.* (emphasis added).)

In other words, the LPA bars Hybrid from informing its staff of the superior benefits it can offer if they reject unionization and/or of the financial liabilities a staff member incurs through membership in Local 338.  (*Id.*)  However, this so-called "neutrality" obligation is not reciprocal such that the Union has to remain "neutral".  (*See generally id.*)  Rather, Local 338 is permitted to intrude into Hybrid's place of business and its operations to extol the supposed benefits of unionization and recruit members.

In particular, Section 3(d) of the LPA provides, in pertinent part, as follows:

> Upon seventy-two hours-notice, the Employer agrees to permit the Union representatives a meeting with the employees at the Location to communicate with employees including through the distribution of materials . . . . It shall be noted that the organizing effort may take more than one meeting to adequately allow the employees to be informed about the Union.

(*Id.* § 3(d).)  In addition, the LPA requires Hybrid to furnish Local 338 with its staff members' names, job classifications, departments, e-mail addresses, telephone numbers, and street addresses during the organizing process.  (*See id.* § 3(a).)

Finally, the LPA circumvents the customary collective bargaining process and compels Hybrid to submit to final and binding arbitration to decide any remaining contested issues regarding a collective bargaining agreement if the parties cannot reach agreement within one (1) year.  (*See id.* § 3(f).)

9

### E. Local 338 Claims to Represent Hybrid's Employees

On April 1, 2025, Local 338 notified Hybrid that a majority of Hybrid's employees had allegedly chosen the Union to represent them for purposes of collective bargaining (the "Local 338 Letter"). (Pl.'s Ex. 11.) The Local 338 Letter claimed that Hybrid had fourteen (14) days to recognize the Union as its employees' representative and cited a provision of the LPA allegedly obligating Hybrid to sign a "Recognition Agreement." (*Id.*)

Hybrid rejected Local 338's assertions for several reasons, including, but not limited to, (i) the constitutionality of the LPA Mandates, (ii) the validity of the LPA (which Hybrid only entered into because of the LPA Mandates), (iii) the legitimacy of the authorization cards that underpin Local 338's claim to recognition, and (iv) the validity of Hybrid's putative obligations to recognize the Union. (*See* Jeffrey-Coker Aff. ¶ 27.) Thereafter, Local 338 initiated several separate proceedings before the NLRB (the "NLRB Proceedings") against Hybrid and its management company, Gotham (a non-party to these proceedings).[12] (*Id.* ¶ 28; Pl.'s Ex. 6.)

### F. Procedural History

On April 14, 2025, Hybrid commenced this action against Defendants. (*See* Pl.'s Ex. 7.) On May 12, 2025, Hybrid filed its First Amended Complaint, asserting a single cause of action for declaratory relief invalidating the LPA Mandates because they are preempted by the NLRA and, therefore, unconstitutional under the Supremacy Clause. (*See* Pl.'s Ex. 5 ¶¶ 90-97.) As relief, Hybrid asked that this Court declare the LPA Mandates unenforceable and declare that Defendants cannot sanction Hybrid for failing to maintain an LPA. (*Id.* ¶¶ 10, 97.)

---

[12] Notably, the NLRB Proceedings will not address, *inter alia*, (i) the contractual obligation imposed by Hybrid's LPA to submit unresolved collective bargaining matters to arbitration, or (ii) the constitutionality of the LPA Mandates.

On June 26, 2025, Defendants moved to dismiss Hybrid's First Amended Complaint, arguing that (i) Hybrid lacked standing to assert its claim, (ii) Defendants had immunity under the Eleventh Amendment, and (iii) Hybrid had failed to exhaust its administrative remedies. (*See* Pl.'s Ex. 8.) Tellingly, Defendants did not argue that the LPA Mandates can be reconciled with (i) the requirements of the NLRA, or (ii) the doctrines of *Garmon* and *Machinists* preemption. (*Id.*)

On December 23, 2025, the Court denied Defendants' motion to dismiss. (Statement of Material Facts ¶ 53; Pl.'s Ex. 9 (the "Decision")). In its Decision, the Court held, *inter alia*, that (i) "Hybrid has standing" because "if it does not sign and maintain an LPA, it will lose its business," (ii) Defendants could not invoke sovereign immunity by alleging that they would not enforce the LPA Mandates because the "law is on the books to be enforced, and Defendants have the responsibility to enforce it," and (iii) this Court has jurisdiction because "[o]nly this court can protect Plaintiff's ability to stay in business without complying with what it claims would be an unconstitutional application of" the LPA Mandates. (Statement of Material Facts ¶ 54; Pl.'s Ex. 9 at 5-7.)

Hybrid now moves for summary judgment on its claim for a declaratory judgment holding that the LPA Mandates are preempted by the NLRA and an unconstitutional violation of the Supremacy Clause to the United States Constitution.

## **ARGUMENT**

Pursuant to Federal Rule of Civil Procedure 56, a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56; *see also N.Y. Bankers Ass'n, Inc.*, 119 F. Supp. 3d at 181. "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Huawei Techs. Co., Ltd. v.*

*PanOptis Patent Mgmt., LLC*, No. 24 CIV. 4708 (AKH), 2026 WL 374982, at \*3 (S.D.N.Y. Feb. 10, 2026).  "Claims turning entirely on the constitutional validity or invalidity of a statute are particularly conducive to disposition by summary judgment as they involve purely legal questions."  *Connecticut ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 93 (2d Cir. 2003); *see also Bldg. Trades Emps.' Educ. Ass'n*, 311 F.3d at 508.

Here, the LPA Mandates are clear, the Defendants' obligations to enforce them are undisputed, and their trespass into the realm governed by the NLRA presents pure questions of law that can be resolved by summary judgment.  For the reasons set forth herein, the Court should grant Hybrid's motion for summary judgment in its entirety.

## I.    THE LPA MANDATES SHOULD BE INVALIDATED DUE TO *MACHINISTS* PREEMPTION

"*Machinists* pre-emption is based on the premise that Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes."  *Chamber of Com. of U.S.*, 554 U.S. at 65.  "The Supreme Court has construed *Machinists* preemption broadly to bar state interference with conduct that Congress aimed to be unregulated in furtherance of policies implicated by the structure of the Act itself."  *Bldg. Trades Emps.' Educ. Ass'n*, 311 F.3d at 509.  This prohibition is rooted in the NLRA's creation of "rights in labor and management both against one another ***and against the State***."  *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 109 (1989) (emphasis added) ("*Golden State II*").

By requiring that Hybrid enter into an LPA to obtain (and maintain) its cannabis license, Defendants have intruded (and continue to intrude) into an area that is intentionally unregulated by the NLRA.  Therefore, the LPA Mandates are subject to *Machinists* preemption, and the Court should grant Hybrid's motion for summary judgment for this reason alone.

12

### A.      Imposing a Contract on Hybrid Is "Anathema" to the NLRA

*Machinists* preemption prohibits state and municipal regulation of areas left "to be controlled by the free play of economic forces." *Lodge 76, Int'l Ass'n of Machinists*, 427 U.S. at 144.  The "purpose of *Machinists* preemption is to guarantee an equitable process for determining terms and conditions of employment." *Casala, LLC*, 789 F. Supp. 3d at 1036.  "States are therefore prohibited from imposing additional restrictions on the economic weapons of self-help," and the "bargaining process" must be left "to the parties." *Golden State I* at 614-16.[13]

For example, the Second Circuit has held that imposing a labor contract on parties to a labor negotiation "has always been **anathema to the NLRA**." *Derrico*, 844 F.2d at 29 (emphasis added).  "When bargaining alone does not produce consensus, the NLRA contemplates that both sides will resort to economic weapons." *Id.*  This is "an integral part of the balance the NLRA strikes between labor and management." *Id.*  Even the Board cannot "compel agreement when the parties themselves are unable to agree" because doing so "would violate the fundamental premise on which the Act is based – private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract." *H. K. Porter Co. v. N.L.R.B.*, 397 U.S. 99, 107 (1970).

Here, the LPA Mandates disrupt the balance created by the NLRA by requiring Hybrid to enter into an LPA that – but for the LPA Mandates – it would not have agreed to. (Jeffrey-Coker Aff. ¶ 21.)  As a consequence, the LPA Mandates deprived Hybrid (and will continue to deprive Hybrid) of the "economic weapons" it would otherwise be entitled to under the NLRA (and shifts the leverage to the Union in the process).  For example, the LPA (i) imposes a non-reciprocal

---

[13] As the Supreme Court held in *Golden State I*, "Congress' decision to prohibit certain forms of economic pressure while leaving others unregulated represents an intentional balance." *Golden State I*, 475 U.S. at 614.

13

obligation of "neutrality" on Hybrid (Pl.'s Ex. 10 §§ 3(b)-(c)), (ii) compels Hybrid to give the Union access to its premises and the contact information of its employees (*id.* § 3(a)), and (iii) forces Hybrid to submit any dispute concerning the collective bargaining process for arbitration (rather than the NLRB) (*id.* § 3(f)).

The contractual restraints set forth in the LPA are not the "free play of economic forces" required by the NLRA (but are rather the product of the LPA Mandates). *Lodge 76, Int'l Ass'n of Machinists*, 427 U.S. at 140, 144, 150; *Golden State I*, 475 U.S. at 614. This is precisely the type of "governmental interference" that *Machinists* preemption is intended to prevent. *Golden State II*, 493 U.S. at 111; *see also Metro. Milwaukee Ass'n of Com.*, 431 F.3d at 281 (giving "the union a leg up to organize . . . . is the kind of favoritism that the National Labor Relations Act anathematizes.").

New York is not the first state that has promulgated a cannabis statute that runs afoul of *Machinists* preemption. Indeed, the legislature in Oregon enacted Measure 119, which required the execution of an LPA as a condition for obtaining and maintaining a license. *Casala, LLC* 789 F. Supp. 3d at 1032. When the plaintiff challenged the constitutionality of Measure 119, the District Court in Oregon invalidated it and concluded that:

> By conditioning license renewal on signing an LPA, Measure 119
> seeks to regulate the relationship between unions and employers.
> This upsets the balance Congress struck in passing the NLRA.
> Thus, Measure 119 is preempted.

*Id.* at 1041. This Court should reach the same conclusion here and find that the LPA Mandates are subject to *Machinists* preemption.

14

### B.    The "Market Participant" Exception Does Not Apply

The sole exception to *Machinists* preemption occurs when a state can show that it is acting as a "market participant" (rather than a regulator) with respect to a particular project or transaction. *See Chamber of Com. of U.S.*, 554 U.S. at 69-71.

"The market participant doctrine differentiates between a State's acting in its distinctive governmental capacity, and a State's acting in the more general capacity of a market participant." *Variscite NY One, Inc.*, 640 F. Supp. 3d at 242 n.7. "In making a determination regarding the market participant exception, a court must consider in each specific context if the government is acting like a private business or a governmental entity." *Id.*; *see also Chamber of Com. of U.S.*, 554 U.S. at 70 (holding that the state will be deemed to be acting "as a market participant" when "the challenged action [is] specifically tailored to one particular job and aimed to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost."). For example, the state will not offend *Machinists* preemption when it intervenes in the labor relations of companies from which the state buys services – provided it is doing so to reduce the cost or increase the quality of those services (rather than to displace the authority of the NLRA or NLRB). *Metro. Milwaukee Ass'n of Com.*, 431 F.3d at 278.

But "when the government ***employs a coercive mechanism*** . . . it acts with the force and effect of the law" and, therefore, it is deemed to be acting as "regulator rather than a market participant." *Airlines for Am.*, 78 F.4th at 1152 (emphasis added). *New York Bankers Association, Inc. v. City of New York* is instructive. In that case, the plaintiff challenged the constitutionality of New York City's Responsible Banking Act or "RBA," which created an agency to (i) assess the "financial and banking services needs throughout the City," (ii) collecting data from each deposit bank operating in New York, and (iii) establish benchmarks and best practices for the deposit banks. *N.Y. Bankers Ass'n, Inc.*, 119 F. Supp. 3d at 172-73. The plaintiff there challenged the

15

RBA on preemption and Supremacy Clause grounds, and the City argued that the RBA was valid because it fell within the market participant exception. *See generally, id.*

The Court, however, rejected the City's argument, finding that the RBA was regulatory in nature, and did not serve the kind of "proprietary purpose" required to invoke the market participant exception. *Id.* at 185-86. As the Court explained, "[w]hen a court assesses whether a governmental policy has a regulatory purpose, it looks ***primarily to the objective purpose clear on the face of the enactment***." *Id.* at 183 (emphasis added). In concluding that the purpose of the RBA was regulatory (rather than proprietary) in nature, the Court noted that the RBA "unambiguously seeks to advance general societal goals and encourage a general policy" – thereby evincing a "regulatory purpose" arising from the City's determination that the analogous federal laws were inadequate. *Id.* at 184.

The Court further explained that the "critical distinction" between the City as a "market participant" and the City as a regulator is whether it was (i) "interacting with private participants in the marketplace" (in which case, it would be considered a market participant), or (ii) placing "conditions on (or at least set forth criteria for) transactions taking place ***among other private participants***" in the financial markets. *Id.* at 186 (emphasis added).

Here, Defendants cannot come close to establishing that they were "market participants" in New York's cannabis marketplace.[14] For starters, the MRTA makes abundantly clear that its purpose is "to regulate, control and tax marihuana." MRTA § 2. In fact, "regulating" and "taxing" the cannabis industry is ***written into the title of the MRTA itself*** (the "R" is for "Regulation," and the "T" is for "Taxation"). And regulation and taxation are quintessential regulatory functions that

---

[14] Indeed, the District Court for the Northern District of New York has already concluded the State could not invoke the market participant exception. *See Variscite NY One, Inc.*, 640 F. Supp. at 242 n.7.

have nothing to do with the State functioning as a participant in New York's cannabis market.  For this reason alone, the market participant exception does not apply.

The LPA Mandates further confirm that the State is not acting as a participant in New York's adult-use cannabis market.  Indeed, by requiring companies (like Hybrid) to enter into LPAs with the Union, Defendants are not "interacting with private participants in the marketplace" (*e.g.*, negotiating with employees, employers, or their unions).  *N.Y. Bankers Ass'n, Inc.*, 119 F. Supp. 3d at 186; *see also Associated Builders & Contractors of R.I., Inc. v. City of Providence*, 108 F. Supp. 2d 73, 81-82 (D.R.I. 2000).  Rather – like the defendant in *New York Bankers Association* – Defendants are simply imposing conditions on companies' ability to participate in New York's cannabis market.  *N.Y. Bankers Ass'n, Inc.*, 119 F. Supp. 3d at 186; *see also Variscite NY One, Inc.*, 640 F. Supp. 3d at 242 n.7; *Variscite NY Four, LLC v. New York State Cannabis Control Bd.*, 152 F.4th 47, 64 (2d Cir. 2025) (New York is acting "as a market regulator" with respect to the cannabis market).  Accordingly, the market participant exception does not apply for this reason as well.

The MRTA's passing reference to a "proprietary interest" in the New York cannabis market does nothing to alter this conclusion.[15]  *See* MRTA § 3(29); *see also Selevan v. New York Thruway Auth.*, 584 F.3d 82, 93-94 (2d Cir. 2009).  In fact, the MRTA is devoid of "***even a suggestion*** that the [government's] role as proprietor drove this law."  *N.Y. Bankers Ass'n, Inc.*, 119 F. Supp.3d at 186 (emphasis added).  For example, the MRTA does not permit Defendants to

---

[15] Indeed, if the MRTA's lone reference to such a "proprietary interest" were sufficient to obviate this Court's preemption analysis, it would create an exception that would almost certainly swallow the entire *Machinists* doctrine – as state and local governments could merely include such language in every piece of legislation to subvert the corresponding federal legislation (and the Supremacy Clause).

17

own or operate a cannabis business in New York.[16]  To the contrary, the MRTA expressly prohibits any individual with an "interest, direct or indirect, either ***proprietary*** or . . . any other manner" in any cannabis business (or in the premises where any cannabis business operates) from (i) being a member of the CCB, or (ii) being employed by OCM.  *Id.* § 7 (emphasis added).

For all these reasons, the market participant exception to the doctrine of *Machinists* preemption does not apply to the LPA Mandates.  Therefore, the Court should grant Plaintiff's motion for summary judgment.

## II.    THE LPA MANDATES SHOULD ALSO BE INVALIDATED BECAUSE OF *GARMON* PREEMPTION

Pursuant to the Supremacy Clause, "federal law preempts state law when the two conflict." *Casala, LLC*, 789 F. Supp. 3d at 1034; *Golden State II*, 493 U.S. at 115 (noting that the NLRA "does have a pre-emptive effect under the Supremacy clause.").  "*Garmon* pre-emption is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the integrated scheme of regulation established by the NLRA." *Chamber of Com. of U.S.*, 554 U.S. at 65.  "*Garmon* preemption is 'unusual' in its breadth" and goes "beyond the usual preemption rule," *Casala, LLC*, 789 F. Supp. 3d at 1035, because "states may not regulate behavior covered by § 7 or § 8 of the NLRA ***or behavior arguably covered*** by either of those two sections," *Bldg. Trades Emps.' Educ. Ass'n*, 311 F.3d at 508 (emphasis added).

"This is not a demanding standard." *Casala, LLC*, 789 F. Supp. 3d at 1036.  A plaintiff must merely "put forth enough evidence to enable the court to find that the Board reasonably could

---

[16] In fact, New York State cannot be a "market participant" without running afoul of the Controlled Substances Act. *See* Robert A. Mikos, *Preemption Under The Controlled Substances Act*, 16 J. HEALTH CARE L. & POL'Y, 5, 32-36 (2013) (state programs that subsidize and/or promote violations of the Controlled Substances Act directly conflict with federal law, violate the Supremacy Clause and are constitutionally invalid); *see also* Mem. from Kleinbard LLC to Pa. Cannabis Coal., Preemption Principles Implicated by LCB Sale of Recreational Marijuana (Mar. 19, 2025) (on file with Law360) (State of Pennsylvania cannot own or operate cannabis dispensaries without causing positive conflict with the Controlled Substances Act).

uphold a claim based on such an interpretation." *Id.*  Here, the LPA Mandates contradict, or arguably contradict (at a minimum), Sections 7 and 8 of the NLRA.  The Court, therefore, should hold that the LPA Mandates are preempted.

### A.    The LPA Mandates Are Preempted Under Section 7 of the NLRA

Section 7 "guarantees the employees right to bargain collectively with representatives *of their own choosing*."  *N.L.R.B. v. Local Union No. 103*, 434 U.S. 335, 344 (1978) (emphasis added).  "There could be no clearer abridgement of § 7 of the [NLRA], assuring employees the right to bargain collectively through representatives of their own choosing or to refrain from such activity, than to grant exclusive bargaining status to an agency selected by a minority of its employees, thereby impressing that agent upon the nonconsenting majority." *Id.*

Federal courts have repeatedly held that constraints on an employee's freedom of choice violate Section 7 of the NLRA.[17]  *See Penn. Nurses Ass'n v. Penn. State Educ. Ass'n*, 90 F.3d 797, 802 (3d Cir. 1996) ("Conduct which . . . induces those employees to change their affiliation, arguably 'constrains or coerces' those employees in their ability to exercise their free choice of an exclusive representative."); *Sheraton-Kauai Corp. v. N.L.R.B.*, 429 F.2d 1352, 1357 (9th Cir. 1970) ("these employees, having been told in effect that they were already under the Statewide agreement and under that agreement would be required to join the Respondent Union, were not exercising the required freedom of choice"); *Baby Watson Cheesecake, Inc.*, 320 NLRB 779, 785 (1996) ("threats" and other tactics "coercing" employees to select a particular union violated Section 8 of the NLRA by infringing employees' guaranteed rights under Section 7); *see also*

---

[17] Notably, both a union and an employer violate Section 8 of the NLRA when either party imposes constraints on an employee's guarantees contained in Section 7 of the NLRA.  *See* 29 U.S.C. §§ 158(a)-(b); *N.L.R.B. v. Katz's Delicatessen of Houston St., Inc.*, 80 F.3d 755, 767 (2d Cir. 1996).

19

*Fernbach ex rel. N.L.R.B. v. Sprain Brook Manor Rehab, LLC*, 91 F. Supp. 3d 531, 543-45 (S.D.N.Y. 2015).

Coercion of employee choice "may reasonably be inferred" where "the employees did not have the complete and unfettered freedom of choice" which the NLRA guarantees through Section 7. *Sheraton-Kauai Corp.*, 429 F.2d at 1357. Under this rubric, there can be no dispute that the LPA Mandates violate the *Garmon* doctrine. Indeed, the LPA Mandates require cannabis companies – like Hybrid – to enter into an LPA with a "bona-fide labor organization" ***before*** (i) applying for their license to operate, or (ii) hiring a single employee. MRTA § 64(1)(i); 9 NYCRR § 120.2(a)(2)(xx). Thus, to obtain its license, Hybrid was required to enter into an LPA ***without the input or consent of its employees***. In fact, the LPA made clear that it "***will apply*** to employees of Hybrid" and would only allow those individuals to "decide whether or not to join ***the Union*** [i.e., Local 338]." (Pl.'s Ex. 10 §§ 1(d), 2(a) (emphasis added).) Because the ***employees*** were not afforded the opportunity to choose their own representation in the first instance – instead, the Union was selected by the ***employer*** (Hybrid), who had to enter into the LPA as a condition to obtaining the license – the LPA Mandates violate Section 7 of the NLRA. *See In re Duane Reade, Inc.*, 338 NLRB 943, 943-44 (2003); *see also N.L.R.B. v. Katz's Delicatessen of Houston St., Inc.*, 80 F.3d 755, 767 (2d Cir. 1996); *Chamber of Com. of U.S.*, 554 U.S. at 65. Accordingly, the Court should conclude that the LPA Mandates are preempted by Section 7 of the NLRA.

### B.    The LPA Mandates Are Preempted by Section 8 of the NLRA

"The Supreme Court . . . has held that Section 8 [of the NLRA] . . . 'implements the First Amendment' with respect to 'an employer's free speech right to communicate his views to his employees.'" *Casala, LLC*, 789 F. Supp. 3d at 1039 (quoting *N.L.R.B. v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969)). Section 8(c) "is indicative of how important Congress deemed such free

debate that Congress amended the NLRA rather than leaving to the courts the task of correcting the NLRB's decisions on a case-by-case basis." *Chamber of Com. of U.S.*, 554 U.S. at 67-68; *see also Intertape Polymer Corp. v. N.L.R.B.*, 801 F.3d 224, 237-38 (4th Cir. 2015) (holding that Congress expressly recognized "the employer's strong interest in preserving its right to speech . . . by enacting Section 8(c) of the Act."). The Supreme Court has "characterized this policy judgment, which suffuses the NLRA as a whole, as favoring uninhibited, robust, and wide-open debate in labor disputes, stressing that freewheeling use of the written and spoken word . . . has been expressly fostered by Congress and approved by the NLRB." *Chamber of Com. of U.S.*, 554 U.S. at 68. Indeed, "[p]ermitting the fullest freedom of expression by each party nurtures a healthy and stable bargaining process." *Intertape Polymer Corp.*, 801 F.3d at 38.

Where a state "needlessly entangles itself in federal labor policy," *Bldg. Trades Emps.' Educ. Ass'n*, 311 F.3d at 512-14, it creates a conflict (or, at a minimum, an arguable conflict) with the free speech protections created by Section 8 of the NLRA, *see Chamber of Com. of U.S.*, 554 U.S. at 73-76. In addition, courts may conclude that a requirement of state or local law is arguably covered by the NLRA (and, therefore, violates *Garmon*) where it "threatens to skew the collective bargaining process by placing economic pressure on plaintiffs." *Bldg. Trades Emps.' Educ. Ass'n*, 311 F.3d at 511.

Here, by requiring Hybrid to enter into an LPA to obtain and maintain the license required to operate its cannabis business, Defendants exerted pressure on Hybrid and distorted the balance of leverage in its negotiations with the Union. As a result of that imbalance, Local 338 demanded – and Hybrid had no choice but to agree – that Hybrid "take a neutral approach to unionization of employees," such that it could "neither help nor hinder the Union's organizing efforts." (Pl.'s Ex. 10 § 3(b).) The LPA also prohibits Hybrid from **supporting** "any petition with the [NLRB] for

21

any election in connection with the invocation of this Agreement." (*Id.* § 3(a).)  Such requirements "chill[] one side of the robust debate which has been protected under the NLRA," inhibit Hybrid's right to freedom of speech and, thus, are preempted by Section 8.  *Casala, LLC*, 789 F. Supp. 3d at 1039; *see also Golden State I*, 475 U.S. at 619.

For this reason, as well, the Court should (i) find that the LPA Mandates are subject to *Garmon* Preemption, and (ii) grant Hybrid's motion for summary judgment.

## **CONCLUSION**

For all of the reasons argued above, this Court should (i) grant Hybrid's motion for summary judgment, (ii) declare the LPA Mandate Provisions are preempted by the NLRA and, therefore, are unconstitutional, and (iii) grant such other relief as the Court deems just and proper.

Dated: New York, New York
    March 27, 2026

        FEUERSTEIN KULICK LLP

        By:   */s/ David Feuerstein*
           David Feuerstein
           Matthew Schweber
           420 Lexington Ave, Suite 2024
           New York, New York 10170
           Tel: (646) 768-0591
           david@dfmklaw.com
           matt@dfmklaw.com
           *Attorneys for Plaintiff*

**STATEMENT OF COMPLIANCE**

I, David Feuerstein, hereby certify that the above Memorandum of Law in support of Plaintiff's Motion for Summary Judgment contains 7,047 words excluding the caption, table of contents, table of authorities, and signature block.

/s/ David Feuerstein
David Feuerstein