UNITED STATES DISTRICT COURT OF NEW YORK
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

HYBRID NYC LLC,                                              :
                                                            :
                                      *Plaintiff*,          :          Case No. 1:25-cv-03067-AKH
                                                            :
                 -against-                                  :
                                                            :          **PLAINTIFF'S RULE**
NEW YORK STATE CANNABIS CONTROL                             :          **56.1 STATEMENT OF**
BOARD, NEW YORK STATE OFFICE OF                             :          <u>**MATERIAL FACTS**</u>
CANNABIS MANAGEMENT, TREMAINE                               :
WRIGHT, in her official capacity as the Chairwoman          :
of the New York State Cannabis Control Board, and           :
FELICIA A.B. REID, in her official capacity as             :
Executive Director of the New York State Office of          :
Cannabis Management,                                        :
                                                            :
                                      *Defendants*.         :

-------------------------------------------------------------------- X

Plaintiff Hybrid NYC LLC ("Plaintiff" or "Hybrid"), as and for its statement pursuant to

Local Rule 56.1, states as follows:

<u>**New York's MRTA and Cannabis Rules and Regulations**</u>

1.      New York's Legislature enacted the Marihuana Regulation and Taxation Act on

March 31, 2021.[1]

2.      Section 2 of the MRTA provides, in pertinent part:

> The intent of this act is to regulate, control, and tax marihuana,
> heretofore known as cannabis, generate significant new tax revenue,
> make substantial investments in communities and people most
> impacted by cannabis criminalization to address collateral
> consequences of such criminalization, prevent access to cannabis by
> those under the age of twenty-one years, reduce the illegal drug
> market and reduce violent crime, reduce participation of otherwise

---

[1] N.Y. CANNABIS LAW et seq. (the "MRTA"). Relevant excerpts of the MRTA are annexed as Plaintiff's Exhibit 1 to the Declaration of David Feuerstein dated as of March 27, 2026 (the "Feuerstein Declaration"), submitted simultaneously herewith. References to "Pl.'s Ex." or "Plaintiff's Exhibit" refer to the exhibits annexed to (i) the Feuerstein Declaration, numbered 1 through 9, and (ii) the affidavit of Akindele Jeffrey-Coker (the "Jeffrey-Coker Aff."), dated as of March 25, 2026, submitted simultaneously herewith, numbered 10 through 11.

> law-abiding citizens in the illicit market, end the racially disparate impact of existing cannabis laws, create new industries, protect the environment, improve the state's resiliency to climate change, protect the public health, safety and welfare of the people of the state, increase employment and strengthen New York's agricultural sector.

(Pl.'s Ex. 1 § 2.)

3.      The MRTA also created Defendant Cannabis Control Board ("CCB") (*see id.* § 7) and Defendant Office of Cannabis Management ("OCM") (*see id.* § 8).

4.      More specifically, the MRTA established the OCM within the Division of Alcoholic Beverage Control (*see id.* § 8; *see also* Pl.'s Ex. 2 ¶ 13), and tasked it with regulatory oversight of the adult-use and medical cannabis marketplace envisioned by the MRTA (Pl.'s Ex. 1 § 8).

5.      The MRTA also tasked the CCB with the authority and duty to promulgate rules and regulations to govern the nascent cannabis industry.  (Pl.'s Ex. 1 § 10; *see also* Pl.'s Ex. 3 ("The Cannabis Control Board is responsible for creating and implementing a comprehensive regulatory framework for medical and adult-use cannabis . . . .").)

6.      Members of the CCB are jointly appointed by the Governor, Senate, and Assembly. (*See* Pl.'s Ex. 1 § 7.)

7.      The MRTA also provides that as a condition for obtaining and maintaining any cannabis license, the applicant would have to enter into and maintain a labor peace agreement ("LPA").  (*See id.* § 64(1)(i).)

8.      Section 3 of the MRTA defines LPA as follows:

> "Labor peace agreement" means an agreement between an entity and a labor organization that, at a minimum, protects the state's proprietary interests by prohibiting labor organizations and members from engaging in picketing, work stoppages, boycotts, and any other economic interference with the entity.

(*Id.* § 3(29).)

9.      Section 64 of the MRTA provides, in pertinent part, that:

> The board shall develop regulations for use by the office in determining whether or not an applicant should be granted the privilege of an initial adult-use cannabis license, based on, but not limited to, the following criteria . . . (i) the applicant has entered into a labor peace agreement with a bona-fide labor organization that is actively engaged in representing or attempting to represent the applicant's employees, and the maintenance of such a labor peace agreement shall be an ongoing material condition of licensure.

(*Id.* § 64(1)(i).)

10.     Finally, Section 66 of the MRTA, concerning license renewal, provides:

> Each applicant must maintain a labor peace agreement with a bona-fide labor organization that is actively engaged in representing or attempting to represent the applicant's employees and the maintenance of such a labor peace agreement shall be an ongoing material condition of licensure.

(*Id.* § 66(5).)

11.     On September 27, 2023, OCM and CCB promulgated the adult-use cannabis rules and regulations (the "Cannabis Regulations"), which contain several parallel provisions concerning LPAs.[2]  (*See generally* Pl.'s Ex. 4.)

12.     Thus, for example, any applicant for a conditional adult-use retail dispensary ("CAURD") license, must attest that the applicant "has entered into a labor peace agreement with a bona fide labor organization and understands that the maintenance of such a labor peace agreement shall be an ongoing material condition of the license."  (*Id.* § 116.3(a)(14).)

---

[2] Relevant excerpts of the Cannabis Regulations are annexed to the Feuerstein Declaration as Plaintiff's Exhibit 4. Collectively, MRTA Sections 3(29), 64(1)(i), 66(5), and Sections 116.3(a)(14), 116.7(c)(7), 120.2(a)(2)(xx), 120.11(c)(2), and 120.12(b)(1) of the Cannabis Regulations form the LPA mandates (the "LPA Mandates").  (*See* Pl.'s Exs. 1, 4.)

13.   Similarly, Section 116.7(c)(7) of the Cannabis Regulations requires that a CAURD "licensee shall have entered into a labor peace agreement with a bona fide labor organization and each party to the agreement has signed such agreement prior to the [conditional adult use retail dispensary license] being granted."  (*Id.* § 116.7(c)(7).)

14.   Furthermore, Section 120.2(a)(2)(xx) of the Cannabis Regulations reads, in pertinent part, that:

> An applicant and each true party of interest in an applicant shall provide information in a form and manner prescribed by the Board, which may include, but is not limited to the following . . . (xx) a copy of the labor peace agreement between the applicant and a bona fide labor organization and an attestation that the applicant understands that the maintenance of such a labor peace agreement shall be an ongoing material condition of the license.

(*Id.* § 120.2(a)(2)(xx).)

15.   Section 120.11(c)(2) of the Cannabis Regulations further provides, in pertinent part, that:

> The application for renewal shall be submitted to the Office, in a manner prescribed by the Board, and include such information as the Board may require, including, but not limited to, providing evidence showing the following . . . the licensee has an executed labor peace agreement with a bona-fide labor organization.

(*Id.* § 120.11(c)(2).)

16.   Finally, Section 120.12(b)(1) reads, in pertinent part, that:

> In addition to the aforementioned, the Board may specifically deny any renewal application based on additional criterion, including, but not limited to, if: (1) the applicant fails to maintain a labor peace agreement with a bona-fide labor organization.

(*Id.* § 120.12(b)(1).)

17.   Put simply, the LPA Mandates condition a cannabis license on the existence and maintenance of an LPA.  (*See* Pl.'s Exs. 1, 4.)

4

**Hybrid's Adult-Use Cannabis Business**

18.    Between August 2022 and September 2022, Defendants solicited applications for CAURD licenses.[3]  (Pl.'s Ex. 2 ¶ 39.)

19.    Hybrid was formed in September 2022 to pursue a CAURD license.  (Jeffrey-Coker Aff. ¶ 7.)

20.    Hybrid qualified for a CAURD license.  (Pl.'s Ex. 5 ¶ 40; Pl.'s Ex. 2 ¶ 40.)

21.    On July 19, 2023, Hybrid was provisionally approved for a CAURD license.  (Pl.'s Ex. 5 ¶ 41; Pl.'s Ex. 2 ¶ 41.)

22.    On September 20, 2024, Hybrid obtained a full-fledged license and opened a dispensary under the name Gotham.  (Pl.'s Ex. 5 ¶ 11; Pl.'s Ex. 2 ¶¶ 11, 41.)

**The Hybrid LPA**

23.    The LPA Mandates imposed an obligation on Hybrid, as part of its application, to (i) execute an LPA with a bona-fide labor organization, and (ii) submit an attestation from its principal acknowledging that an LPA is an "ongoing material condition of the license."  (*See* Pl.'s Ex. 1 § 64; Ex. 4 §§ 116.3(a)(14), 116.7(c)(7), 120.2(a)(2)(xx).)

24.    At the time, Local 338, RWDSU/UFCW ("Local 338" or the "Union") was the only union in New York State willing to represent employees working in a cannabis company.  (Jeffrey-Coker Aff. ¶ 12.)

---

[3] To qualify for a CAURD license, an applicant must be a "justice-involved individual" with a "qualifying business." (*See* Pl.'s Ex. 4 § 116.4.)  A "justice-involved individual" is someone who was convicted of a New York "marihuana-related offense" before March 31, 2021, or someone whose parent, spouse, child, legal guardian, or dependent has been convicted of such an offense prior to March 31, 2021.  (*Id.* § 116.4(a)(2)(i).)  A "qualifying business" means a business that a justice-involved individual owns at least ten percent of, and that the business has realized profits for at least two years.  (*Id.* § 116.4(a)(2)(iii).)

25.     Thus, the LPA Mandates effectively compelled Hybrid to enter into an LPA with Local 338, which it did on March 4, 2024 (the "Hybrid LPA").  (Pl.'s Ex. 5 ¶¶ 45, 51; Pl.'s Ex. 2 ¶¶ 45, 51; Pl.'s Ex. 10.)

26.     As set forth in the Hybrid LPA, Local 338 and Hybrid entered into that agreement to "establish the following procedure to address the Union's efforts to organize employees in any existing or new location owned or operated by [Hybrid] in the State of New York in which employees are not represented by a labor organization."  (Pl.'s Ex. 10.)

27.     The Hybrid LPA contains a one-year term and renews automatically unless either party cancels it.  (*Id.* § 2(c).)

28.     The Hybrid LPA contained several provisions that are favorable to the Union. (*Compare* Pl.'s Ex. 1 §§ 64(1)(i), 66(5), *and* Pl.'s Ex. 4 §§ 120.2(a)(2)(xx), 120.11(c)(2), 120.12(b)(1), *with* Pl.'s Ex. 10.)

29.     By way of example only, the Hybrid LPA circumvents the traditional bargaining process between the parties by compelling Hybrid to submit any dispute regarding contested issues to a binding arbitration.  (Pl.'s Ex. 10 § 3(f).)

30.     More specifically, Section 3(f) provides, in pertinent part, that:

> If the parties are unable to agree to a collective bargaining agreement within twelve (12) months after the commencement of good-faith bargaining regarding a collective bargaining agreement, the requesting party shall provide immediate notice of its request to provide the remaining open sections to an agreed upon neutral, for interest arbitration. If and to the extent, the parties are able to cure and arrive at a resolution of the remaining open sections within forty-five (45) calendar days from the notice from the requesting party, then the parties shall continue good-faith negotiations. If and to the extent that within forty-five (45) calendar days following notice, the parties are unable to reach a resolution on such remaining open sections, the parties agree to submit all open provisions and issues to final and binding interest arbitration, but in all cases the parties shall continue to bargain in good faith to resolve the conflict

prior to an arbitrator rending their final opinion. If they are unable to mutually select an arbitrator, the parties shall select an arbitrator to set the open provisions and resolve any other issues in accordance with the procedures of the American Arbitration Association's Labor Arbitration Rules.

(*Id.* § 3(f).)

31.     In the absence of the LPA, the bargaining process between Hybrid and the Union would continue indefinitely.  (*Compare* Pl.'s Ex. 10, *with* Jeffrey-Coker ¶ 16.)

32.     Additionally, the LPA's provisions regarding the Union's "Recruitment Process" reflect the bargaining imbalance that was improperly created by the LPA Mandates.  (*See* Pl.'s Ex. 10 § 3.)

33.     For example, the Hybrid LPA requires Hybrid to "furnish the Union with a complete list of employees . . . including names, job classifications, departments, street addresses, telephone numbers, and e-mail addresses," upon Local 338 sending an "intent to organize" Hybrid's employees.[4]  (*Id.* § 3(a).)

34.     By virtue of this provision, Local 338 was effectively chosen as the bargaining representative for Hybrid's employees.  (*See generally id.*)

35.     Moreover, the Hybrid LPA obligated Hybrid to facilitate Local 338's attempts to have Hybrid's employees validate its appointment (which it would not be obligated to do in the absence of an LPA).  (*See id.*)

36.     The Hybrid LPA contains two broad neutrality provisions.  (*See id.* §§ 3(b)-(c).)

37.     First, Section 3(b) of the Hybrid LPA provides that:

The Employer [*i.e.*, Hybrid] agrees to take a neutral approach to unionization of employees. Neutrality means that the Employer will neither help nor hinder the Union's [*i.e.*, Local 338] organizing

---

[4] Hybrid's personnel are employed by Gotham NYC Management LLC ("Gotham") with which Hybrid has a management services agreement.  (Jeffrey-Coker Aff. ¶ 25, n.6.)

7

effort. Both the Union and the Employer will conduct themselves with mutual respect for each other during any organizing effort.

(*Id.* § 3(b).)

38.     Second, Section 3(c) of the Hybrid LPA provides that: "During organizing efforts, the Employer's managers, supervisors and other representatives will remain neutral."  (*Id.* § 3(c).)

39.     In the absence of these provisions, Hybrid would not have to remain "neutral" in the bargaining process with the Union.  (Jeffrey-Coker Aff. ¶¶ 15-21.)

40.     The Hybrid LPA also imposed additional obligations on Hybrid with respect to the bargaining process.  (*See id.* ¶¶ 16-21; *see also* Pl.'s Ex. 10.)

41.     For example, Section 3(d) of the Hybrid LPA provides, in pertinent part, that:

> Upon seventy-two (72) hours-notice, the Employer [*i.e.*, Hybrid] agrees to permit the Union [*i.e.*, Local 338] representatives a meeting with the employees at the Location [*i.e.*, Hybrid's place of business] to communicate with employees including through the distribution of materials. Union representatives will not disrupt the Employer's operations or unreasonably interfere with employee production. It shall be noted that the organizing effort may take more than one meeting to adequately allow the employees to be informed about the Union.

(*Id.* § 3(d).)

42.     The Hybrid LPA further provided that upon the Union informing Hybrid that it successfully recruited a majority of Hybrid's employees, Hybrid and the Union were to meet within fourteen days "to count the [authorization cards designating the Union as the collective bargaining representative], each with their own representative present during the count."  (*Id.* § 3(e).)  Section 3(e) further provides that "[i]mmediately after verifying the Union's majority, the Employer will recognize the Union as the representative of the employees . . . and sign the attached Recognition Agreement."  (*Id.*)

43.    Section 4 of the Hybrid LPA delineated several terms regarding "labor peace" provisions between Hybrid and the Union.  (*Id.* § 4.)

44.    For example, Hybrid and Local 338 agreed to, *inter alia*, "make all possible efforts to resolve any disagreements or conflicts that may arise on any level."  (*Id.* § 4(a).)

45.    The Hybrid LPA also provided that the parties would arbitrate several categories of disputes.  (*See id.* §§ 4(b)-(c).)

46.    Section 4 of the Hybrid LPA provides, in pertinent part, that:

> The parties agree to resolve any dispute over the interpretation of this agreement through expedited arbitration in accordance with the American Arbitration Association's Labor Arbitration Rules. . . .
>
> The parties agree that the arbitrator has the authority to direct the breaching party to specifically perform its obligations under this provision. The parties agree that in the event the arbitrator determines that a party to this Agreement has breached a term of this Agreement, the non-breaching party may choose to terminate this agreement. . . .

(*Id.*)

**The Union Claims to Represent Hybrid's Staff**

47.    On April 1, 2025, Local 338 asserted, via letter (the "Local 338 Letter"), that it "obtained the support of a majority of employees employed by Gotham at its retail facility . . . to represent them for purposes of collective bargaining."  (Pl.'s Ex. 11 at 1.)

48.    Local 338 further claimed that Hybrid (i) had to recognize the Union as the employees' representative, and (ii) was obligated to enter into a "Recognition Agreement" with the Union.  (*See id.*; *see also* Pl.'s Ex. 10 § 3(e).)

9

49.     Between June 2024, and September 2025, Local 338 initiated four separate proceedings before the National Labor Relations Board (the "NLRB") against Gotham and Hybrid.[5]  (*See* Pl.'s Ex. 6.)

**Procedural History**

50.     On April 14, 2025, Hybrid commenced this action against Defendants.  (*See* Pl.'s Ex. 7.)

51.     On May 12, 2025, Hybrid filed its First Amended Complaint, asserting a single cause of action for declaratory relief invalidating the LPA Mandates as unconstitutional because it is preempted by the National Labor Relations Act.  (*See* Pl.'s Ex. 5 ¶¶ 90-97.)

52.     On June 26, 2025, Defendants moved to dismiss Hybrid's First Amended Complaint.  (*See* Pl.'s Ex. 8.)

53.     On December 23, 2025, this Court denied Defendants' motion to dismiss (the "Decision").  (*See* Pl.'s Ex. 9.)

54.     More specifically, this Court's Decision held, *inter alia*, that (i) "Hybrid has standing" because "if it does not sign and maintain an LPA, it will lose its business," (ii) "[t]he Eleventh Amendment is not a bar to this lawsuit" because "[t]he law is on the books to be enforced, and Defendants have the responsibility to enforce it," and (iii) this Court has jurisdiction because "[o]nly this court can protect Plaintiff's ability to stay in business without complying with what it claims would be an unconstitutional application of" the LPA Mandates.  (*Id.* at 5-7.)

---

[5] Pursuant to this Court's December 23, 2025 Decision (Pl.'s Ex. 9, ECF No. 31), Hybrid provided an update of the current proceedings before the NLRB (Pl.'s Ex. 6, ECF No. 32).  As of this date, there has been no change in the status of those proceedings.

55.     In denying Defendants' motion to dismiss, the Court also requested additional information concerning certain proceedings between Hybrid and the Union before the NLRB (the "NLRB Proceedings").  (*Id.*)

56.     On December 30, 2025, Hybrid informed the Court that the Union commenced the NLRB Proceedings against Hybrid and Gotham (as "a single employer or joint-employer"), which primarily concern alleged unfair labor practices levied against Hybrid and Gotham.  (Pl.'s Ex.  6.)

57.     Hybrid further informed the Court that the NLRB Proceedings would notably not impact the outcome of the instant litigation because (i) the NLRB proceedings neither compel Hybrid to enter into a collective bargaining agreement nor compel Hybrid to make bargaining concessions, and (ii) the NLRB Proceedings do not address the unconstitutional nature of the LPA Mandates.  (*Id.*)

58.     On January 29, 2025, Defendants filed their Answer to Hybrid's First Amended Complaint.  (Pl.'s Ex. 2.)

Dated: New York, New York
       March 27, 2026

                                        FEUERSTEIN KULICK LLP

                                        By:  ___/s/ David Feuerstein_____
                                             David Feuerstein
                                             Matthew Schweber
                                             420 Lexington Ave, Suite 2024
                                             New York, New York 10170
                                             Tel: (646) 768-0591
                                             david@dfmklaw.com
                                             matt@dfmklaw.com
                                             *Attorneys for Plaintiff*

11